AO-106 (Rev. 06/09)-Application for Search Warrant

# FILED

## UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

AUG 1 2 2025

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of | ) |
| *Information Associated with daviddime3@yahoo.com* | ) Case No. 25-mj-692-MTS |
| *Stored at a Premises Controlled by Apple Inc.* | ) |
| | ) **FILED UNDER SEAL** |
| | ) |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A." This court has authority to issue this warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).
located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **18 U.S.C. §§ 2252(a)(2) and (b)(1)** | **Receipt of Child Pornography** |

The application is based on these facts:
  **See Affidavit of Special Agent Blair Newman, attached hereto**.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Blair Newman, FBI
*Printed name and title*

Subscribed and sworn to by phone.

Date: 8-12-2025

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Mark T. Steele, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of Information Associated with daviddime3@yahoo.com Stored at a Premises Controlled by Apple Inc. | Case No. _____<br><br>**FILED UNDER SEAL** |

### Affidavit in Support of an Application for a Search Warrant

I, Blair Newman, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1. I make this affidavit in support of an application for a search warrant for information associated with **daviddime3@yahoo.com** (the **"Subject Account,"**) that is stored at a premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.  I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since May 2019. I am assigned to the Tulsa Resident Agency of the Oklahoma City Division. My primary duties as a Special Agent with the FBI include but are not limited to investigating drug and gang violations, violent crimes, crimes against children, and crimes occurring in Indian Country.

3.  Specifically, I have extensive experience working cases involving child pornography, child exploitation, and coercion and enticement of a minor in violation of 18 U.S.C. §§ 2251, 2252, 2252A, and 2422, respectively. All of these cases have required the review of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. As such, I am familiar with the tactics utilized by individuals who collect, distribute, and produce child pornographic material, as well as groom children to participate in sexually explicit conduct.

4.  I am familiar with this investigation and the facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on

2

the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

5. Based on my training, research, experience, and the facts as set forth in this affidavit, there is probable cause to believe violations of Title 18 U.S.C. §§ 2252(a)(2) and (b)(1) (Receipt of Child Pornography) have been committed, and evidence of this crime, as set forth in Attachment B, is located in the **Subject Account** as further described in Attachment A.

## Jurisdiction

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## Definitions

7. The following definitions, inclusive of all definitions contained in 18 U.S.C. § 2256, apply to this affidavit and the attachments incorporated herein:

a.    "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the

3

visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct;

b.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer or electronic device to access the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses may also be static, which means the ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet;

c.    "Electronic Mail," commonly referred to as email (or e-mail), is a method of exchanging digital messages from an author to one or more recipients. Modern email operates across the Internet or other computer networks. Email systems are based on a store-and-forward model; that is, email servers accept, forward, deliver, and store messages. Neither the users nor their computers are required to be online simultaneously; they need only connect briefly, typically to an email server, for as long a period of time as it takes to send or receive messages. One of the most commons methods of obtaining an email account is through a free web-based email service provider such as, Outlook, Yahoo, or Gmail. Anyone with access to the Internet can generally obtain a free web-based email account;

4

    d.     A "hash value" or "hash ID" is a unique alpha-numeric identifier for a digital file. A hash value is generated by a mathematical algorithm, based on the file's content. A hash value is a file's "digital fingerprint" or "digital DNA." Two files having identical content will have the same hash value, even if the file names are different. On the other hand, any change to the data in a file, however slight, will change the file's hash value, even if the file name is unchanged. Thus, if two files have the same hash value, they are said to be identical, even if they have different file names;

    e.     "Cloud storage service" refers to a publicly accessible, online storage provider that can be used to store and share files in large volumes. Users of cloud storage services can share links and associated passwords to their stored files with others in order to grant access to their file collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop computers, laptops, mobile phones or tablets, from anywhere. Many services provide free access up to a certain size limit;

    f.     The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state;

    g.     "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years;

h.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form;

i.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person; and

j.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

### Characteristics Common to Individuals who Exhibit a Sexual Interest in Children

8.  Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who sexually exploit children, and who produce, distribute, receive, possess, and/or have access with intent to view child pornography:

a.    Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing

6

children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity, or from sexualized conversations with children;

b.    Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media and at times, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts;

c.    Such individuals almost always possess and maintain digital or electronic files of child pornographic material, that is, their pictures, videos, photographs, correspondence, mailing lists, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, videos, photographs, correspondence, and mailing lists for many years;

d.    Likewise, such individuals often maintain their child pornography images and sexually explicit or suggestive materials in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view,

7

and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis;

e.    Based on my training and experience, I also know that such individuals have taken their electronic devices and storage media, which contain their collections of child pornography, with them when they move or change residences;

f.    Such individuals may also take it upon themselves to create their own child pornography or child erotica images, videos or other recordings, or engage in contact sex offenses with children. These images, videos or other recordings may be taken or recorded covertly, such as with a hidden camera in a bathroom. Studies have shown there is a high cooccurrence between those who traffic in child pornography and commit sex offenses with children. Such individuals may also attempt to persuade, induce, entice, or coerce child victims in person or via communication devices to self-produce and send them child pornography or to meet in person for sex acts. These images, videos or other recordings are often collected, traded, or shared;

g.    Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage

means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted"[1] it;

h.        Such individuals also may correspond with and/or meet others to share information and materials. This correspondence from other child pornography distributors/possessors is often concealed, rarely destroyed, and can contain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography;

i.         Based on my training and experience, I know that such individuals may use their financial information to buy and sell child pornography online and purchase software used to mask their online activity from law enforcement. For instance, individuals may purchase cryptocurrency such as Bitcoin to buy and sell child pornography online. The use of cryptocurrency provides a level of anonymity because it masks the user's identity when conducting online financial transactions and provides a means of laundering illicit proceeds. Financial information may provide a window into the identities of individuals seeking to buy or sell child pornography online by tying the illicit transactions back to the user. Financial information contained on an electronic device containing child pornography may

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

also provide indicia of ownership. Further, based on my training and experience, I

know individuals involved in the trafficking of child pornography may use

sophisticated software, such as router configuration software, virtual private

networks, proxy servers, cryptocurrency exchanges, or other anonymizing software,

in conjunction with these illicit financial transactions to provide dual layers of

anonymity and prevent law enforcement detection. Financial information may

indicate which services were purchased to obscure an individual's identity; and

j.      Such individuals prefer not to be without their child pornography for

any prolonged period of time. This behavior has been documented by law

enforcement officers involved in the investigation of child pornography throughout

the world.

### Probable Cause

9.  On August 7, 2024, FBI Agents interviewed Joseph Gunther Sampson, who

confessed to viewing, receiving, and sending child pornography. Sampson provided

Agents with consent to search multiple electronic devices, to include his iPhone SE.

On September 16, 2024, Sampson was indicted in the Northern District of Oklahoma

(24-CR-298) and charged with Receipt and Distribution of Child Pornography and

Possession of Child Pornography in Indian Country. On October 17, 2024, Sampson

pleaded guilty to both counts and on April 3, 2025, was sentenced to 121 months

imprisonment plus 15 years of supervised release for each count, to run concurrently.

10. In November 2024, I reviewed an extraction of Sampson's iPhone SE and identified child pornography sent between Sampson and telephone number 405-698-6024, which law enforcement databases and open-source research identified as belonging to Michael Dean Pullen, date of birth XX/XX/1972, and home address 2723 NW 19th Street, Oklahoma City, OK 73107.

11. Court records indicated that on October 1, 2024, Pullen was indicted in the Western District of Oklahoma for receipt and distribution of child pornography as well as possession of material containing child pornography (CR-24-438-J). Oklahoma City Police Department was the investigating agency.

12. On November 20, 2024, I contacted Oklahoma City Police Department Detective Stephanie Alfred via telephone regarding Pullen. Detective Alfred advised during her review of an extraction of Pullen's cellphone, she also observed Pullen communicating with a telephone number with a 539-area code, which covers Tulsa, OK and surrounding areas. Detective Alfred agreed to provide the FBI with the communications.

13. On December 12, 2024, Detective Alfred provided a chat between Pullen and telephone number 539-895-9673. Open-source research identified telephone number 539-895-9673 as belonging to David Francesco DIMEGLIO, date of birth May 5, 1983, social security number XXX-XX-1955, and home address 2806 S 53rd West Ave, Tulsa, OK 74107.

14. On December 13, 2024, I reviewed the text messages between Pullen and DIMEGLIO, which ranged from April 25, 2024, to May 14, 2024. During that time, Pullen sent DIMEGLIO two photos and five videos containing child pornography. Below are descriptions of the child pornography DIMEGLIO received:

**B7AEFCD7-0C24-4617-BBC0-D913CA0AB618_444038.JPG** is a photograph of a nude prepubescent white male with light brown hair being penetrated anally by a white adult male in a gray t-shirt, nude from the waist down. No faces are visible. The background of the photo is blurred.

**_Libr_1(3).MP4** is a 10:27 video of a nude postpubescent Asian male with dark brown hair being penetrated anally by a nude adult Asian male. The adult Asian male later inserts his penis into the postpubescent Asian male's mouth. Faces of both males are visible.

**_Libr_1(5).MP4** is a 3:13 video of a nude minor male whose age cannot be estimated from the video due to only being seen from behind. The nude minor male is being penetrated anally by an adult male. The nude minor male has light brown tanned skin and a white butt. The adult male has a similar complexion. The nude minor male has dark brown hair. No faces are visible.

**_Library_SMS_Attachments_42_02_CBC541C1-E6E2-433F-B747-5CBE46AC4256_IMG_3040.JPG** is a photograph of a nude adult white male with an Acer laptop on his bed depicting an open window containing a photograph of an

12

adult male's penis anally penetrating a white male toddler. To the right of the laptop, there is text that reads:

DON'T BE AFRAID TO RAPE

It's a mistake tp (sic) avoid nonconsentual (sic) child sex. No matter what kind of sex you have with kids, you'll always be judged as a rapist. So don't hold back.

Each child molester has on average 35 victime (sic) in their life.

A true pedophile:

has no age limit

enjoys rape

always penetrates

never uses a condom

loves hearing their victims scream

uses threats and torture to stop kids talking

The next time you're alone with a child, try rape. You'll thank yourself later.

BE PROUD.

   **_Libr_1(6).MP4** is a 0:31 video of a nude post-pubescent Hispanic or Asian male with dark brown hair and dark brown pubic hair being penetrated anally by an adult male with a similar skin tone. The post-pubescent male's face is visible.

   **_Libr_1(7).MP4** is a 3:01 video of a light-skinned black or Hispanic male with braces, dark brown hair, a mustache, and a tattoo on his left shoulder, wearing

13

a black Adidas tank top and gray camouflage shorts, orally penetrating a male toddler in an orange shirt with a similar complexion. The adult male forces down the head of the male toddler. Faces of both males are visible.

_Libr_1(8).MP4 is a 1:11 video of a Hispanic male with his pants down, rubbing his penis while young children are visible from behind a fence behind him.

15. On January 8, 2025, the FBI served AT&T with an administrative subpoena for subscriber information and toll records for telephone number 539-895-9673 for the previous month, from December 8, 2024, to January 7, 2025. On January 8, 2025, AT&T provided the FBI with records indicating telephone number 539-895-9673 was assigned to AirVoice, LLC[2] and was activated on January 12, 2024. Toll records provided by AT&T indicated the telephone number 539-895-9673 was regularly used from December 8, 2024, to January 7, 2025.

16. On April 14, 2025, the FBI served HTH Communications, the parent company of AirVoice, LLC, with an administrative subpoena for telephone number 539-895-9673. On April 28, 2025, HTH Communications provided the FBI with records indicating telephone number 539-895-9673 was assigned to David DIMEGLIO, home address of 2806 S 53rd West Ave, Tulsa, OK 74107, on January 12, 2024.

---

[2] AirTalk is a program provided by AirVoice Wireless, LLC, an FCC-licensed Eligible Telecommunication Carrier (ETC). AirVoice Wireless operates on the AT&T network. AirTalk Wireless has been offering No Contract wireless service to consumers since 1999. HTH Communications is the parent company of AirTalk Wireless and AirVoice Wireless.

17. On July 7, 2025, FBI Special Agent Brian Dean and I went to DIMEGLIO's residence to speak with him. Near the front door of the house, I observed a sign on the window that read, "In case of emergency please save our pets." The sign indicated there were two cats in the house. DIMEGLIO's phone number, 539-895-9673, was handwritten below as the emergency phone number. After no one answered the door, I left my business card and wrote on the back, requesting DIMEGLIO contact me. I then called DIMEGLIO under the ruse of a data breach notification. DIMEGLIO advised he was at the doctor and would call back.

18. On July 9, 2025, I spoke with DIMEGLIO via telephone at 539-895-9673. DIMEGLIO confirmed he received my business card and saw me leave it from his Eufy doorbell camera. DIMEGLIO stated he had lived in Tulsa for almost three years.

19. On the call, DIMEGLIO stated he had his current phone number 539-895-9673 since March 2024. DIMEGLIO's service provider was AirTalk Wireless. DIMEGLIO had many cellphones. Since obtaining his current phone number, DIMEGLIO had used an iPhone 11, a TCL Android smart phone, and an iPhone SE. DIMEGLIO first used the TCL Android after his iPhone 11 broke over a year ago and was currently using it again because his iPhone SE was water damaged a few weeks ago.

15

20. Before DIMEGLIO obtained his current phone number, he had a New Jersey phone number and an iPhone 14 Pro Max. DIMEGLIO also recently mailed an old Android phone to a friend in New Jersey who was going through a hard time.

21. DIMEGLIO used cloud storage on his phones but did not pay monthly for the extra storage. As a result, when one of DIMEGLIO's phones was damaged, he lost all photos before 2019.

22. On July 14, 2025, the FBI served AT&T with an administrative subpoena for subscriber information and toll records for telephone number 539-895-9673 from January 1, 2024, through December 31, 2024. On July 15, 2025, AT&T provided the FBI with records, that indicated that during the requested time frame, DIMEGLIO used four devices: a TCL T607DL smart phone, an Apple iPhone 6, an Apple iPhone 11, and an Apple iPhone SE. DIMEGLIO used an Apple iPhone 11 when he was communicating with Pullen in April through May 2024. These records were consistent with DIMEGLIO's statements to me that he used multiple cell phones, including an iPhone 11, a TCL Android smart phone, and an iPhone SE.

23. In my training and experience, individuals who use iPhones and Android smart phones commonly "back up" their data in iCloud and Google accounts. Accordingly, the data on an iPhone or Android smart phone can be easily transferred to another device without any loss of data. Moreover, DIMEGLIO told me that he used cloud storage. Therefore, I believe is likely that data from the iPhone 11 he was

16

using while communicating with Pullen may have been copied to his other electronic devices.

24. As previously mentioned, individuals who participate in the sexual exploitation of children, to include enticement and production, distribution, receipt, and/or possession of child pornography typically retain their "collection" for many years in a manner which facilitates quick and repetitive access. These individuals will often use an array of storage mediums to include physical devices like external hard drive as well as cloud-based services.

25. On July 18, 2025, Honorable Christine D. Little, U.S. Magistrate Judge, Northern District of Oklahoma, authorized warrants to search DIMEGLIO and his residence (25-MJ-609-CDL and 25-MJ-608-CDL, respectively).

26. On July 30, 2025, I interviewed DIMEGLIO at his residence. DIMEGLIO confirmed that he used the 539-895-9673 phone number. I began to show DIMEGLIO his messages with Michael Pullen and asked if he remembered anyone sending him images of child pornography. DIMEGLIO said that he did remember receiving child pornography, but he recalled receiving it from a man named David. Specifically, DIMEGLIO received approximately eight photos or videos of child pornography from an individual with the first name David, who had a 405-area code. DIMEGLIO recalled receiving child pornography from a total of approximately four to six people. DIMEGLIO repeatedly told me that he deleted all of the child pornography that he received because he found it "disgusting" and

17

"disturbing." DIMEGLIO advised in approximately 2019, a sexual partner showed him child pornography.

27. In addition, DIMEGLIO stated that when he was 18 years old (in approximately 2001), he filmed himself having sex with his then-boyfriend, who was 15 years old. DIMEGLIO advised police arrested him and seized the video, although charges were later dropped. When recalling the incident, DIMEGLIO asked, "Oh my god, am I a pedo?"

28. On July 30, 2025, Agents executed search warrants 25-MJ-609-CDL and 25-MJ-608-CDL and seized multiple Apple devices from DIMEGLIO's residence, to include an iPhone, iPad, and two Apple laptops. DIMEGLIO signed an FBI FD-941 Consent to Search Computer(s) form and provided his passcodes to his iPhone and devices.

29. Upon seizing the iPhone, I immediately put the iPhone into airplane mode in accordance with best practice. On August 5, 2025, pursuant to 25-MJ-608 and the FD-941 Consent to Search Computer(s) form, I attempted to extract the iPhone using FBI-approved tools. However, I was unable to extract the iPhone because of existing damage to the iPhone's charging port. Specifically, when I plugged a lightning cable into the iPhone to connect it to the first FBI-approved tool, it connected and then immediately disconnected multiple times. When I plugged a lightning cable into the iPhone to connect it to the second FBI-approved tool, it did not even connect. This was consistent with information DIMEGLIO previously

18

provided about his iPhone being water damaged and unable to hold a charge. On August 5, 2025 and August 6, 2025, pursuant to 25-MJ-608-CDL, I conducted a manual review of the iPhone, which contained more than 34,000 photos and videos. However, because the iPhone was in airplane mode, I was unable to view most of the videos and full resolution photos, as they were stored in DIMEGLIO's iCloud and could not be downloaded with the iPhone in airplane mode. I navigated to DIMEGLIO's contact card and saw the phone number associated with DIMEGLIO and the device was 539-895-9673. I then navigated to DIMEGLIO's settings and identified the Apple ID associated with his iCloud account to be daviddime3@yahoo.com.

30. On August 7, 2025, the FBI requested Apple Inc. preserve any information for the **Subject Account**. Apple Inc. provided the FBI with preservation confirmation number 202501224306.

31. Based on my training and experience, I know that Apple products can easily contain the same or similar data by connecting them to the same iCloud account. I further know that the type of data that can be downloaded onto a new device from an old device includes media, such as images and videos, as well as applications and user history, which may include location evidence.

32. Based on my training and experience investigating cases involving child exploitation, I know that offenders often keep their illicit material indefinitely and often transport their illicit materials to multiple devices. They do this to ensure that

19

they do not lose it because this illicit content is difficult to find. Individuals who produce their own illicit content are the most likely to keep it indefinitely and on multiple devices because they were personally involved in producing the content.

33. I also know in my training and experience that Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, passwords, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple.

### Background Concerning Apple[3]

34.  Apple is a United States company that produces the iPhone, iPad, and iPod

Touch, all of which use the iOS operating system, and desktop and laptop computers

based on the Mac OS operating system.

35.  Apple provides a variety of services that can be accessed from Apple devices

or, in some cases, other devices via web browsers or mobile and desktop applications

("apps").  As described in further detail below, the services include email, instant

messaging, and file storage:

a.    Apple provides an email service to its users through email addresses at

the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in

real-time. iMessage enables users of Apple devices to exchange instant messages

("iMessages") containing text, photos, videos, locations, and contacts, while

FaceTime enables those users to conduct audio and video calls.

---

[3] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

c.   iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.   Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.   Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well

22

as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

      f.   Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

      g.   App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

   36. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple

23

ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

37. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide a means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

38. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an

24

Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

39.  Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and repair history for a device.

40.  Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo

Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

41. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

42. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and

documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

43. In addition, the user's account activity, logs, stored electronic communications, passwords, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

### Information to be Searched and Things to be Seized

47. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

48. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by

using the warrant to require Apple to disclose to the government digital copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

49. In conducting this review, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the account described in Attachment A. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with e-mails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but do not contain any searched keywords.

29

## Conclusion

50.  Based on the information above, there is probable cause to believe violations

of Title 18 U.S.C. §§ 2252(a)(2) and (b)(1) (Receipt of Child Pornography) have been

committed, and evidence of this crime, as set forth in Attachment B, is located in the

**Subject Account** as further described in Attachment A.

51.  I request to be allowed to share this affidavit and the information obtained

from this search (to include copies of digital media) with any government agency, to

include state and local agencies investigating or aiding in the investigation of this

case or related matters, and to disclose those materials as necessary to comply with

discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Blair Newman
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to by phone on August ___, 2025.

MARK T. STEELE
UNITED STATES MAGISTRATE JUDGE

30

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **daviddime3@yahoo.com**

(the **"Subject Account"**), that is stored at premises owned, maintained, controlled, or

operated by Apple Inc., a company headquartered at One Apple Park Way,

Cupertino, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    All records or other information regarding the identification of the Subject Account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the Subject Account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.    All records or other information regarding the devices associated with, or used in connection with, the Subject Account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media

Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"),
Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),
Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"),
Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital
Network Numbers ("MSISDN"), International Mobile Subscriber Identities
("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

    c.   The contents of all instant messages associated with the Subject Account,
including stored or preserved copies of instant messages (including iMessages, SMS
messages, and MMS messages) sent to and from the account (including all draft and
deleted messages), the source and destination account or phone number associated
with each instant message, the date and time at which each instant message was sent,
the size and length of each instant message, the actual IP addresses of the sender and
the recipient of each instant message, and the media, if any, attached to each instant
message;

    d.   The contents of all files and other records stored on iCloud, including all iOS
device backups, all Apple and third-party app data, all files and other records related
to iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive,
iCloud Tabs and bookmarks, and iCloud Keychain, and all passwords, notes,
images, videos, device settings, and bookmarks;

    e.   All activity, connection, and transactional logs for the Subject Account (with
associated IP addresses including source port numbers), including iCloud logs,

2

iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My and AirTag logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

f.    All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with AirTags, Location Services, Find My, and Apple Maps;

g.    All records pertaining to the types of service used;

h.    All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

i.    All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18 U.S.C. §§ 2252(a)(2) and (b)(1) (Receipt of Child Pornography) involving David Francesco Dimeglio, and occurring from May 5, 2001 through the present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.  Images/videos/gifs of child pornography or child erotica; files containing images/videos/gifs; and data of any type relating to the sexual exploitation of minors or a sexual interest in children, material related to the possession thereof, and data of any type related to any person employing, using, persuading, inducing, enticing, or coercing any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting such visual depiction of such conduct, in any form wherever it may be stored or found, including, but not limited to:

i.  Graphic Interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG) of child pornography; files relating to the distribution, receipt, or possession of child pornography, or information pertaining to an interest in child pornography;

      ii. Files in any form containing the visual depictions of minors engaged in

sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the

sexual exploitation of minors; and

      iii. Stories, text-based files, motion pictures, films, videos, and other

recordings of visual depictions of minors engaged in sexually explicit

conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual

exploitation of minors.

b. Information, correspondence, records, documents or other materials

pertaining to the possession, receipt or distribution of visual depictions of minors

engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining

to the sexual exploitation of minors or a sexual interest in children, that were

transmitted or received using computer, cellular device, personal digital assistant,

or some other facility or means of interstate or foreign commerce, common

carrier, or the U.S. mail including, but not limited to:

      i. Correspondence including, but not limited to, chat logs, and electronic

messages, establishing possession, access to, or transmission through

interstate or foreign commerce, including by United States mail or by

computer, of visual depictions of minors engaged in sexually explicit

conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual

exploitation of minors or a sexual interest in children;

2

iii. Any and all electronic and/or digital records and/or documents pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce including by United States mail or by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 or relating to the sexual exploitation of minors;

iv. Any and all electronic and/or digital records and/or documents including any and all address books, names, and lists of names and addresses of minors visually depicted while engaging in sexually explicit conduct, defined in Title 18, United States Code, Section 2256; or relating to the sexual exploitation of minors;

v. Any and all records of Internet usage including usernames and e-mail addresses and identities assumed for the purposes of communication on the Internet. These records may include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage mediums;

vi. Any physical keys, encryption devices, dongles and similar physical items necessary to access computer equipment, storage devices or data; and

3

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

c.     Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

d.     Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

e.     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4